UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-CR-142 (DSD/KMM)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

                                     **RESPONSE IN OPPOSITION TO
MOTION TO REVOKE
DETENTION ORDER**

CHRISTOPHER JAMES RAJKARAN,

        Defendant.

    The United States of America, by and through its attorneys, W. Anders Folk, Acting United States Attorney, and Miranda E. Dugi and Joseph H. Thompson, Assistant United States Attorneys, hereby submits its response in opposition to defendant Christopher James Rajkaran's motion to revoke the order for detention in his case pursuant to 18 U.S.C. § 3145(b).

    After having failed to obtain release after two hearings in the Eastern District of New York, Rajkaran now contests his detention a third time, based on the same claims he relied upon previously. The Court should deny his motion and Rajkaran should remain detained pending trial.

## I.    Factual and Procedural Background

### a.  *Instant Offense Conduct*

Rajkaran is charged by indictment with conspiracy to commit securities fraud (18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5), securities fraud and

aiding and abetting the same (15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, 18 U.S.C. § 2), and wire fraud (18 U.S.C. § 1343).  As outlined in the indictment, Rajkaran and his coconspirators hijacked dormant public companies traded over-the-counter, and used their control over those companies to manipulate their stock by executing a "pump and dump" scheme.  In furtherance of the scheme, Rajkaran and others promoted hijacked companies' stock via the internet, including on websites like investorshub.com and Twitter.

Rajkaran's promotional posts included materially false and fraudulent information, including false claims regarding the companies' leadership and financial holdings.  Among the means used to promote the conspiracy were Rajkaran's Twitter and investorshub.com accounts, which employed the user name "Blue Phoenix" and the variation "Blue Pheonix."  Rajkaran has acknowledged using that screenname on Twitter; other public social media profiles associated with Rajkaran (e.g., LinkedIn, Instagram) reflect use of the same screennames.

With respect to one of the hijacked companies described in the indictment, Encompass Holdings (ECMH), trading records reflect Rajkaran's purchase of approximately 29 million shares on or about November 2, 2017.  Within days of that purchase, Rajkaran was promoting the stock on investorhub.com by disseminating false information regarding the company's leadership, which was purportedly coconspirator Mark Miller and his company, DDG Properties, but in truth had been hijacked by Miller, Rajkaran, and their coconspirators.  For example, on or about November 8, 2017, Rajkaran posted multiple times about Miller and DDG Properties on investorshub.com, falsely claiming, among other things: "CEO IS BIZ IS WORTH OVER 15 MILLION DOLLAR

WITH ALL HIS BIZ AND I THINK DDG PROPERTIES IS VALUED EST OF 8 TO 10 MILLION DOLLARS," and "yup CEO porbbly worth closed to 20 million in real estate holding and construction equipment ... heard he owns several strip malls in mn."  In fact, as Rajkaran was aware, Miller was not a legitimate CEO, and ran a small building company in Minnesota with nothing approaching the holdings Rajkaran claimed.   Shortly thereafter—between on or about November 10 and November 14, 2017—Rajkaran sold more than 34 million shares in ECMH for a return of approximately 150% on his investment.

Other hijacked businesses included Bell Buckle Holdings (BLLB).  Correspondence between Miller and Rajkaran from February 2018 reflects Miller sending Rajkaran documents used to hijack the company and to create a fraudulent press release to pump the stock.  In correspondence related to the fraudulent press release, Rajkaran is referred to as the business partner of Miller and coconspirator (and purported CEO) Saeid Jaberian, who is also copied on the correspondence with Rajkaran.   During this period, Rajkaran purchased more than 30 million shares of BLLB stock.  He sold his shares on or about March 1, 2018 for a nearly 100% return on his investment in approximately two weeks' time.

### b.  Rajkaran Ties to Guyana

Rajkaran was born in Guyana, and maintains close ties to the country—with his wife, young child, residence, and business ties in Guyana.  Email and financial records reflect that while Rajkaran was living in New York, he traveled regularly to Guyana and sent money transfers to Guyana regularly throughout 2020 to at least five recipients,

including his now-wife.  He sought emergency travel authorization to Guyana during COVID-19 for the birth of his child in August 2020, and after participating in a Securities and Exchange Commission deposition in September 2020, decamped to Guyana, returning to the United States only briefly and infrequently (approximately twice) to visit his children in the United States.  It was on one of these visits that the United States was able to execute its warrant to arrest Rajkaran on June 18, 2021.

According to a recorded statement Rajkaran made in Winter 2021 from Guyana,[1] he had no intention of returning to New York permanently:

> Once I get there [to New York], I got to take care of some stuff. I got to transfer some money around and see what I got to do with some business stuff and come right back [to Guyana].
> . . .
> I'm telling you, listen. I love where I'm at. Life has been great. I don't have nothing to worry about here [Guyana]. I have a beautiful kid. I have a beautiful wife. I'm living good.

During a post-*Miranda* interview with special agents from the Federal Bureau of Investigation, Rajkaran stated he had no money, was staying with his mother and grandmother in New York, and relied on unemployment assistance.  Rajkaran

---

[1]     The United States proffered the substance of this statement to the Court at Rajkaran's first detention hearing.

acknowledged that he had a fish exportation business in Guyana, but claimed that it was not profitable.

Rajkaran has no apparent personal ties to Minnesota beyond his involvement in the scheme, including his relationship to Minnesota-based coconspirators Mark Miller and Saied Jaberian.

### c. *Rajkaran's Financial and Criminal History*

According to the Pretrial Services report, Rajkaran's only reported asset was a checking account containing $800, and claimed monthly financial obligations in the amount of at least $2470. Rajkaran does not account for the source of funds used to satisfy these obligations, instead providing unverified reports of self-employment as a "marketer" for the past eight years and claiming variable income ranging from $1500 to $2500 per month, as detailed in the Pretrial Services report. Rajkaran's mother reported believing that he was employed part-time with State Farm Insurance Company, which Rajkaran himself did not report. (Discovery materials from the investigation revealed that Rajkaran previously worked at State Farm, but did not at the time of his arrest.)

The Pretrial Services report notes that Rajkaran's criminal record revealed multiple alias dates of birth, an additional social security number, and alternate names. All but his most recent offense required issuance of bench warrants. His most recent offense (a Class A misdemeanor) included convictions on four counts of "Act in Manner Injure Child Less than 17" and resulted in a probationary sentence that was not discharged until March

2018—meaning that Rajkaran was actively engaged in the instant offense while he was on probation.

### d. Post-Arrest Conduct

Rajkaran's Pretrial Services report in New York reflects that after his arrest in this case, Rajkaran provided the Court with false information about his intent to travel to Guyana. Rajkaran reportedly told Pretrial Services in New York that he "was planning a visit to Guyana in August 2021," when in fact, according to flight records, Rajkaran was scheduled to return to Georgetown, Guyana on JetBlue from John F. Kennedy Airport in Queens, New York on June 23, 2021—five days after his arrest in this case. Rajkaran's mother, P.S., also told Pretrial Services that she believed Rajkaran would be traveling to Guyana prior to June 29, 2021.

Shortly after his arrest in this case, monitored calls reflect that Rajkaran began contacting his coconspirators, instructing them not to cooperate with law enforcement and/or attempting to coordinate efforts to inculpate particular coconspirator(s).

### e. Order for Detention

After a contested hearing in the Eastern District of New York on June 18, 2021,[2] the Honorable James R. Cho found that Rajkaran posed too great a risk of flight to be released on any conditions proposed and ordered Rajkaran detained and removed to the District of Minnesota. Before the magistrate judge was the recommendation of detention by U.S.

---

[2]   Rajkaran has not provided copies of transcripts of the hearings. However, the undersigned attended both of Rajkaran's detention hearings via Zoom and provides the summary herein based on contemporaneous notes.

Probation and Pretrial Services and associated report, which reflected Rajkaran's history of bench warrant. For his part, Rajkaran requested that he be released to his mother's residence under essentially the same conditions he seeks now, with the same sureties. Proffered information from the government reflected Rajkaran's long history of and current ties to Guyana, absence of ties to Minnesota, and strong incentive and ability to flee given the instant charges. The Court detained Rajkaran based on his risk of nonappearance. According to local EDNY practice, the magistrate judge nonetheless gave Rajkaran leave to submit a revised proposed bail package in support of his bid for release.

Rajkaran then sought to reopen the detention proceedings before a new magistrate judge in the Eastern District of New York. Despite Rajkaran's efforts to proffer additional information regarding sureties to permit his release to family or associates in New York, the magistrate judge found that he presented too great a risk of flight given his ties to Guyana and the charged conduct. Accordingly, Rajkaran remained bound over for removal to the District of Minnesota.

Contrary to claims set forth in Rajkaran's instant motion to revoke the detention order, both magistrates noted Rajkaran's risk of flight given the instant offense and ties to Guyana as the primary basis for detention, not merely "concern for past offenses dating back as early as 2002, as well as expired Protection Orders." (Doc. 47: Def. Mot. at 1).

### f. *Proceedings in Minnesota*

Rajkaran made his initial appearance in the District of Minnesota on July 8, 2021, where he sought to raise the issue of detention again. He did so yet again at his arraignment before the Court on July 12, 2021, where the Court noted Rajkaran's prior two detention

hearings in New York and that Rajkaran's next recourse was a motion to revoke or appeal his detention order. Thereafter, his counsel filed the instant motion. Rajkaran's counsel represented to the Court and counsel for the government that he was not seeking immediate disposition of the motion, and wish to consider whether or not to withdraw it. He ultimately decided to proceed with his motion to revoke the detention order, which is now present before the Court.

## II.    Analysis

Where a magistrate judge outside the court of original jurisdiction has ordered detention of a defendant, the defendant may file "with the court having original jurisdiction over the offense, a motion for revocation of the order," and such a motion "shall be determined promptly." 18 U.S.C. § 3145(b). The motion is subject to de novo review. *See United States v. Maull*, 773 F.2d 1479, 1484 (8th Cir. 1985) (en banc) ("[T]he court acts de novo and makes an independent determination of the proper pretrial detention or conditions for release."). The Court should not revoke a detention order supported by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003).

There is ample basis for this Court to find—as two other federal magistrates did— that Rajkaran poses a serious risk of nonappearance by a preponderance of the evidence. Given Rajkaran's absence of ties to Minnesota, his strong ties to a country where timely extradition would likely prove impracticable (and likely impossible), his criminal history, his precarious financial and employment situation, the seriousness of the charges against

him, the strength of the evidence, and his willingness to lie to Pretrial Services, the Court should deny Rajkaran's motion.

On their own, Rajkaran's strong ties to Guyana would be cause for considerable concern about his risk of nonappearance in this case.   His apparent lack of candor to the Court about those ties—and other matters discussed below—compounds these concerns. Indeed, Rajkaran lied to Pretrial Services about his intended—imminent—travel plans for the days after his arrest, as well as his current living situation.

The Pretrial Services reports likewise reveal concerning inconsistencies in information regard Rajkaran's employment, sources of income, and financial obligations. Rajkaran's motion notes that "[h]is wife and daughter rely upon his work in the United States to survive financially in Guyana."  (Doc. 47 at 3).  However, his motion fails to mention prior to his arrest, Rajkaran was relying upon weekly unemployment payments from the State of New York for $249 and submitted only unverified reports of self-employment as a "marketer" for the past eight years, as detailed in the Pretrial Services report.   Additionally, Rajkaran's instant motion is accompanied by an "Affidavit of Support" in the form of an email from P.S., Rajkaran's mother. (Doc. 47-1).  His motion fails to mention that Rajkaran made stock trades in P.S.'s name and email address in connection with the scheme.

As evidenced by even the brief examples provided herein, the evidence against Rajkaran is strong.  The charges subject Rajkaran to considerably penalties, including a recommended sentence of approximately two years' imprisonment under the U.S.

Sentencing Guidelines even if Rajkaran were to plead guilty.  Accordingly, the nature of the charges and the strength of the case both support a finding in favor of detention.

Finally, Rajkaran's criminal history also weighs in favor of detention.  Rajkaran's criminal history spans nearly two decades, and includes multiple instances requiring the issuance of bench warrants.  Perhaps even more concerning is that Rajkaran was already under court supervision at the same time he engaged in the instant offense.

All these circumstances—particularly when coupled with an evident lack of candor to the Court—reveal that no condition or combinations of conditions would suffice to assure Rajkaran's appearance in Minnesota for future proceedings.

**III.    Conclusion**

For all the foregoing reasons, the United States respectfully requests that the Court deny Rajkaran's motion.


Dated: September 16, 2021                         Respectfully Submitted,

                                                  W. Anders Folk
                                                  Acting United States Attorney

                                                  */s/ Miranda E. Dugi*
                                                  BY: MIRANDA E. DUGI
                                                  (NY: 5140546)
                                                  JOSEPH H. THOMPSON
                                                  Assistant U.S. Attorneys